[No. 24789. Department Two. December 19, 1933.]

ENDICOTT-JOHNSON CORPORATION, *Respondent,* v. O. T. BLOOM, *Defendant,* SEATTLE ASSOCIATION OF CREDIT MEN, *Appellant.*[1]

*Robbins & Rickles* and *Bayley & Croson,* for appellant.

*Stern & Stern,* for respondent.

TOLMAN, J.—Respondent, as plaintiff, brought this action to recover for merchandise sold and delivered to the defendant Bloom. A writ of attachment was sued out and levied upon a retail stock of merchandise then in Bloom's possession.

[1]Reported in 27 P. (2d) 1069.

Shortly after the action was commenced, leave having been first obtained, a complaint in intervention was filed setting up that, some months prior to the bringing of the action, Bloom had executed and delivered a chattel mortgage to the intervener, which mortgage had been duly filed for record; that six hundred dollars only had been paid thereon, and something less than three thousand dollars of the amount secured thereby remained unpaid. The mortgage was alleged to be a first lien upon all of the stock merchandise in the possession of Bloom upon which the plaintiff's attachment had been levied.

Plaintiff answered the complaint in intervention with appropriate denials, and in an affirmative defense to the effect that the chattel mortgage was made without any consideration and for the purpose of hindering, delaying and defrauding Bloom's creditors, particularly the plaintiff. The affirmative matter in the answer was denied by the reply.

Bloom did not appear in the action. The case came on for trial before the superior court on the merits, resulting in findings of fact from which we quote:

"That on and prior to the 29th day of November, 1932, defendant O. T. Bloom was the owner of a certain mercantile business known as Bloom's Ready-to-Wear, located and conducted at 315 State street in the city of Marysville, county of Snohomish, state of Washington, consisting of a stock of goods, wares and merchandise, ladies' and men's furnishings and ready-to-wear, together with fixtures and furniture.

"That on November 29, 1932, said O. T. Bloom made, executed and delivered to the intervener a chattel mortgage in writing, in the amount of $3,539.59, covering said goods, wares and merchandise, furniture and fixtures, which said chattel mortgage was filed in the office of the auditor of Snohomish county, Washington, on the 2nd day of December, 1932, under auditor's file No. 524505.

608

"That intervener is now the owner and holder of said chattel mortgage; that the mortgagor has paid on account thereof the sum of $600, and has fully performed the terms of said mortgage; that there still remains an unpaid balance on said mortgage of $2,939.59; that the value of the property described in said mortgage does not exceed the amount of the unpaid balance thereof, and the mortgagor therein named does not have any equity in said mortgaged property over and above the unpaid balance of said mortgage. . . .

"That said chattel mortgage was executed by the defendant O. T. Bloom for the purpose of preventing any of his creditors, including this plaintiff, from immediately enforcing their claims, against said defendant by attachment or other seizure of property of said defendant, and in order to secure to said defendant an extension of time in which to pay the claims and demands of his creditors. That the mortgagee in said mortgage named was not a creditor of the mortgagor but represented certain claims of creditors of the mortgagor, and accepted said mortgage in trust for the purpose of paying ratably to all creditors of the mortgagor proceeds from the sale of the mortgaged property in the ordinary course of business, after deducting the necessary expenses of operating the business of said mortgagor, the purchase of new merchandise stock for cash, and expense of administration of said trust mortgage.

"That at the time of the execution of said mortgage, the mortgagor, as well as the mortgagee, honestly believed that said trust mortgage would permit payment in full to all of the mortgagor's creditors, over a period of time, and said mortgage was executed by the mortgagor at the instance of a number of his creditors, including his largest creditor. That the object, intent and design of the mortgagor in executing said chattel mortgage was to prevent any creditor or creditors, including this plaintiff, from subjecting the assets of defendant, as described in said mortgage, to the immediate payment of his obligations to his creditors, including this plaintiff."

From which findings, the trial court drew the conclusion that, though the mortgage was made in actual good faith, still it was made with the design to hinder and delay creditors and is therefore void as against the plaintiff. A judgment followed accordingly dismissing the complaint in intervention, and the intervener has appealed.

The facts as found afford a sufficient basis for the conclusion we have reached, but a little amplification may tend toward clarity and a better understanding.

It appears without any dispute that Mr. Bloom had been engaged in retail merchandising for many years, and that, at about the time the mortgage was executed, he found himself in possession of a stock of merchandise which invoiced about seven thousand dollars, and had on his books accounts receivable from customers aggregating about the same amount. Some, at least, of his indebtedness was overdue, and one or two claims were in the hands of collectors who were pressing him. He had no money with which to meet these demands.

Under these circumstances, he consulted with a number of his creditors, among them the largest in amount, and, through the Seattle Association of Credit Men, a notice was sent to all of his creditors, calling a meeting. A substantial number of the creditors attended the meeting, probably a majority in amount, and that meeting took action recommending and advising the course which was afterwards followed. These circumstances all enter into the question of Mr. Bloom's purpose, object and intent, and explained his testimony upon that subject which is as follows:

"Q. Now, Mr. Bloom, what was your object in giving this mortgage? A. Well, to protect my creditors. Q. Any in particular, or all of them? A. All of them. Q. Was it your intention to prevent your stock from

being attached by any one creditor? A. Yes, sir, so it wouldn't be attached by one creditor and so that they'd all get the same."

The chattel mortgage, among other things, contains the following recitals and provisions:

"WHEREAS, said mortgagor desires to obtain an extension of time in which to pay the claims and demands of his creditors, a list of which creditors is herewith furnished to said mortgagee, showing the amounts respectively due and owing to said creditors by said mortgagor; and,

"WHEREAS, said mortgagee is willing to take a mortgage from said mortgagor on all his property of every kind and description as security for the payment by said mortgagor to said mortgagee of the sum of Three Thousand ($3,000) Dollars in the manner hereinafter provided for, to apply on each and every bona fide creditor's claim filed with said mortgagee, equally and ratably, and without preference, and whether or not said creditor may have been mentioned in said list furnished to said mortgagee: . . .

"To HAVE AND TO HOLD, all and singular, the personal property aforesaid, forever, but in trust, nevertheless, for the use and benefit of the present unsecured creditors of said mortgagor, . . .

"That until the total indebtedness secured by this mortgage is fully paid and satisfied, said mortgagor shall pay unto the said mortgagee from the proceeds of the sales of said goods, wares and merchandise herein mortgaged, the net balance remaining after deducting the necessary expenses of operating the business of said mortgagor and the purchase of new merchandise stock for cash sufficient for the needs of said business, together with all amounts collected from accounts receivable; and for the above purpose a true and correct accounting shall be had between said mortgagor and said mortgagee on or before the 10th day of each and every month during the life of this mortgage of the proceeds of said business for the preceding month, but in no event shall the payments made under said monthly accounting be less than the

sum of Two Hundred ($200) Dollars, the same to be credited on said note in accordance with its terms, any excess, however, to be credited on the last payment due on said note.

"That if the claims against said mortgagor filed hereunder with said mortgagee exceed the sum of $3,000 together with interest, and expenses as hereinafter provided for, the said mortgagor agrees to pay such amount in excess of $3,000 before this mortgage will be void and of no effect; but in the event that such amount is less than $3,000, the difference between such amount and $3,000 shall be credited as a final payment on said note and mortgage.

"That at the option of the mortgagee it may select the manager, bookkeeper, clerk or cashier of the business of said mortgagor to take charge of his finances, accounts and books of record, his reasonable wages to be paid to him, the same as other employees of the business; that said mortgagee may further, at its option, by its agents or officers, take charge of, supervise and control the business of said mortgagor in any manner it may deem best to secure the claims of creditors, as security for which this mortgage is given. . . .

"That as long as the conditions of this mortgage are fulfilled, the said mortgagor is to remain in peaceful possession of said property, and in consideration thereof agrees to keep said property in as good condition as it now is, reasonable wear and tear excepted."

It appears that all of the provisions of the mortgage were by Bloom fully and satisfactorily complied with, up to the time when the attachment was levied.

■ The several errors assigned present but a single question, and that is: May an individual debtor, though insolvent, in good faith execute a trust mortgage to secure all of his creditors ratably which will be good as against one or more creditors, who, refusing to accept under the mortgage, seek to subject the mortgaged property to the payment of their claims,

thereby securing to themselves priority over all other creditors?

The question seems to be of considerable importance to the commercial world, and it is therefore essential that a fair, just and equitable rule be established, if that may be done under our recognized rules of law.

From the beginning it has been the rule in this state that a debtor, though insolvent, may in good faith prefer one or more of his creditors over all other creditors, even to the extent of the exhausting of his assets. This court adopted that rule in *Turner v. Iowa National Bank,* 2 Wash. 192, 26 Pac. 256, and has never departed from it. *Vietor v. Glover,* 17 Wash. 37, 48 Pac. 788, 40 L. R. A. 297; *McAvoy v. Jennings,* 44 Wash. 79, 87 Pac. 53; *Zent v. Gilson,* 52 Wash. 319, 100 Pac. 739; *Puget Sound National Bank v. More,* 159 Wash. 5, 291 Pac. 1081.

Since a debtor may so prefer a creditor or creditors by a direct conveyance, there appears to be no valid reason why the conveyance may not be to a trustee for the benefit of those to be preferred. Indeed, such conveyances to trustees were upheld in both the *Vietor* and the *McAvoy* cases, *supra.*

This mortgage, if valid, must necessarily hinder and delay any creditor who chooses not to take under it; and Bloom, in his testimony quoted, clearly indicated his primary purpose was to secure an orderly and equal distribution to all of his creditors, and incidentally to hinder and delay only those who sought a special advantage or priority which inevitably would greatly lessen the realizable value of his assets and result in a substantial loss to all other creditors.

Such an intent to hinder and delay must inherently exist in every preference. No one can ever be preferred without thereby in some degree hindering and

delaying others. To hold that this incidental hindering and delaying invalidates this mortgage, would be to overrule all of our previous decisions upholding preferences.

"Every mortgage necessarily tends to hinder and delay creditors other than the mortgagee, but if fairly and honestly made is neither an unjust or unlawful interference with the rights of others, within the terms of a statute making conveyances void if intended to hinder or delay creditors." 12 R. C. L. 549.

"It is immaterial that other creditors may by the preference be delayed or wholly prevented from obtaining payment; for such is the natural result of the transaction; but a distinction is drawn between the inevitable result of a legal act, and a bad intent." 12 R. C. L. 574.

The question of what is a bad intent which will invalidate such a conveyance, seems to be of vital importance here. Bloom's intent is shown, and very clearly shown, by the whole chain of circumstances; and by his testimony interpreted in the light of those circumstances. So construed, we can see nothing but a good intent, namely, to realize as rapidly as possible the full value of all of his assets and distribute the result ratably to all of his creditors under the direction and control of the trustee (which the mortgage by its terms made absolute), and in the meantime to see that no one destroyed the value or took away any of those assets from the general fund intended for all.

To indicate a bad intent, there must be a hindering of creditors by the debtor for his own advantage in some way such as a conveyance in trust for his own use and benefit, or a hindering which leaves the debtor free to make disposition of the property according to his own will or for his own purposes. Perhaps, in addition to that, any device which has for its primary purpose the preventing and averting of legal action

by creditors, thus rendering the courts helpless to enforce just demands, would, in most cases, indicate the bad intent which the law condemns.

It seems probable that the judgment below was induced by the failure to correctly construe and evaluate the case of *Shapiro v. Wilgus,* 287 U. S. 348, upon which the respondent chiefly relies. The facts in that case, as stated in the opinion, may be briefly summarized as follows:

One Robinson, a dealer in lumber in Pennsylvania, was unable to pay his debts as they matured, but believed that, if his creditors would grant extensions, he could pay in full and have a surplus left. Most of his creditors were willing to grant time. Two creditors were unwilling, and threatened immediate suit. "Thus pressed, the debtor cast about for a device whereby the business might go on and the importunate be held at bay." Robinson adopted the plan of forming a Delaware corporation, to which he conveyed all of his assets (all in Pennsylvania), and received in return the stock of the corporation and a covenant from it to assume and pay the debts. Three days later, he invoked the jurisdiction of the Federal court on the ground of diversity of citizenship, and alleged that suits by creditors brought and to be brought would ruin the business and dissipate the assets which, if undisturbed, could be made to pay the debts in full. "To accomplish these ends there was a prayer for the appointment of receivers with an accompanying injunction." The district court appointed receivers, and presumably granted the injunction.

A creditor of Robinson's applied to the court for leave to levy an execution upon the property in the hands of the receivers. It was this application which finally reached the supreme court. In passing upon

the question thus presented, Mr. Justice Cardozo, among other things, said:

"The conveyance and the receivership are fraudulent in law as against non-assenting creditors. They have the unity of a common plan, each stage of the transaction drawing color and significance from the quality of the other; but, for convenience, they will be considered in order of time as if they stood apart. The sole purpose of the conveyance was to divest the debtor of his title and put it in such a form and place that levies would be averted."

The whole opinion of the court is predicated upon the finding or conclusion that the *sole purpose* was to place the title to the debtor's property in such form and place that levies would be averted, and with that in mind, the language used is wholly proper and announces a just rule of law. Since we have already seen that, in this case, we have no such basic fact, it is at once apparent that Judge Cardozo's language, which follows that which we have quoted, can be no guide to us here.

In the light of the long settled law of this state upholding preferences made in good faith, we must, in order to be consistent, uphold the validity of the chattel mortgage in question.

The judgment is reversed, with directions to enter judgment establishing the chattel mortgage as a first and prior lien.

BEALS, C. J., HOLCOMB, BLAKE, and GERAGHTY, JJ.. concur.