784

DOUGLAS COUNTY MEMORIAL HOSPITAL ASSOCIATION, *Respondent,* v. JOE NEWBY *et al., Appellants.*[1]

*James T. Nelson,* for appellants.

*Ned W. Kimball,* for respondent.

DONWORTH, J.—This is an action to recover a balance of $592.76 alleged to be due and owing by defendants to Douglas County Memorial Hospital (herein called the hospital) for services rendered to defendant wife.

Simultaneously with the filing of the complaint, the hospital sued out a writ of attachment, pursuant to which the sheriff attached and took possession of one 1950 Ford sedan which was in the defendants' possession.

Defendants' answer admitted incurring the original hospital bill, but alleged as an affirmative defense that the parties had entered into a verbal agreement that defendants would pay the sum of twenty dollars per month until the bill was paid in full; that pursuant to this agreement, defendants had, prior to the commencement of the action, paid

'Reported in 278 P. (2d) 330.

a total sum of two hundred fifty dollars to the hospital on the account, and since then, and prior to preparing their answer, they had paid an additional fifty dollars into the registry of the court, leaving an unpaid balance in the amount of $512.76. It was further alleged that this verbal agreement had been confirmed by a written agreement to the same effect, entered into at the time defendant wife was finally discharged from the hospital.

These affirmative allegations were denied *in toto* by the hospital's reply.

At the time of the trial, the amount of the hospital bill had been reduced to $452.76. Judgment was entered against defendants in that amount. Costs were allowed the hospital, except certain items incurred relative to the attachment proceedings.

Defendants have appealed from the judgment entered against them. They assign error in respect to two findings of fact entered by the trial court, and further assert that the judgment is not supported by the findings and that it "is contrary to law."

In this court, appellants, in their brief, discuss two contentions argued by respondent hospital in the trial court, to wit, (1) that the agreement to pay twenty dollars per month upon the account was void because not authorized or ratified by its board of trustees, and (2) that the agreement was void for lack of consideration. In its brief, respondent ignores the first contention and confines its argument in the support of the judgment solely to the second contention. Therefore, the only question now before us is whether there was a legal consideration for appellants' agreement to pay twenty dollars per month.

Since neither party presented any oral argument in this court in support of its position, we will discuss the evidence rather fully as it bears upon the issue of consideration.

There is no dispute as to the basic facts. Appellants lived with their four children on the Barnes ranch near Waterville. The husband is a farm hand, and was so employed between November, 1952, when his wife first was admitted to

the hospital, and February 10, 1953, when she was discharged the last time.

The husband testified that, when his wife first entered the hospital in November, 1952, he told the head nurse that they were unable to pay for hospitalization. When she was discharged from the hospital the first time later that month, they were unable to pay the account. At that time, he made a verbal agreement with the head nurse (who had apparent authority to make such arrangements) to pay twenty dollars per month on the hospital bill owing at that time.

On February 10, 1953, when appellant wife was discharged the last time, the head nurse told the husband that the board of trustees desired a signed agreement to pay twenty dollars per month. Appellants were financially unable to pay their account in full, and the respondent was aware of that fact. The proposed agreement to pay twenty dollars a month was entirely satisfactory to appellant husband, and he executed a printed form prepared by the hospital (which is part of each patient's hospital record), reading as follows:

"CONTRACT

"We                                        Date 2-10-53
I agree to pay to the account of Letta Newby with Douglas County Memorial Hospital Association as follows:
 "$.............................on or before discharge $20.00 or more on
          week
2nd day of each month
:.............................Sign here   Joe L. Newby Address.....................
Credit Department
                            .............................Address................."

At this time, the balance amounted to $715.86, so that the parties must have contemplated that appellants would have three full years in which to pay off the account at the rate of twenty dollars per month.

Pursuant to the oral and written agreements the husband, prior to the commencement of this action, made monthly payments, which were accepted by the hospital in reduction of appellants' account in the following amounts:

*Payments*

| | |
|---|---|
| November 18, 1952 | $50.00 |
| January 3, 1953 | 20.00 |
| February 2, 1953 | 20.00 |
| February 27, 1953 | 30.00 |
| April 2, 1953 | 20.00 |
| May 11, 1953 | 20.00 |
| June 1, 1953 | 20.00 |
| August 10, 1953 | 20.00 |
| September 9, 1953 | 20.00 |
| October 3, 1953 | 10.00 |
| Total | $230.00 |

On October 3, 1953, appellant husband contacted Mr. Wainscott, the then president of the hospital, and stated that he had heard from his employer that the board of trustees of the hospital (herein called the board) wanted him to sign a promissory note for the balance of the account. The president, in effect, requested the husband to sign a note which could be discounted at a bank. According to the husband's testimony:

"I met up with him downtown. And I had heard that the board was wondering if I would go to the bank and sign a note to pay this off in full. So I approached Mr. Wainscott and told him if the board would go along with me and the bank would accept me, I would go in to the bank to sign a note, to have the banker to figure out the interest. And if the hospital would help me on the interest on this deal, because I wasn't set up with any interest. And Mr. Wainscott refused it. That was on October 3."

The board member's version of this conversation was:

"Well, he said that Forrest [his former employer] had talked to him and said I wanted to see him about his account down at the hospital. And I said, 'Yes, we have talked about it.' And he said, 'Well,' he said, 'I understand that you would like to put that in the bank.' And I said, 'Yes, we would like to get our accounts in shape so that we could get the money off if we could.' And I said, 'Would you sign a note so we could get it in the bank?' Well, he kind of flew to pieces. He said, 'I won't sign no damn note.' And I said, 'The bank won't take any piece of paper unless it is an interest-bearing note.' And he said, 'Well, I signed a paper down there, and that's all I will sign.' And I said, 'There is no

use about taking it to the bank because the bank won't take any piece of paper because the paper you sign is just one of the cards in the hospital.' And so he got pretty rough. And I said, 'I don't think any other hospital would carry a bill like that without a note or without some paper or something definite and make arrangements for it to be paid.' And he said, 'Well, I think they would.' And I said, 'I am sure they wouldn't.' And then he got a little bit louder, and he said that the hospital bill we had sent him, that the bill was far larger than it should be. And I said, 'Now, just a minute,' I said, 'this bill has run quite a while, hasn't it?' And he said, 'Yes, quite a little while.' And I said, 'Did you ever take it up with the board?' And he said, 'No.' 'Well,' I said, 'you should take it up with the board. If there is something wrong with it, I am sure they will be glad to hear you and see what was wrong.' "

No note was ever signed by appellants.

This request by the hospital for a promissory note may have been inspired by the fact that, in the middle of September, 1953, the husband ceased to work on the farm near Waterville, where he had been employed, and had obtained employment on another farm about three miles from Bridgeport, Washington, "on this side of the river" (still in Douglas county).

According to the testimony given by the head nurse in her deposition (she was then no longer employed by the hospital), the policy of the hospital was to accept any patient who needed hospitalization regardless of his ability to pay for such service. At the several times when appellant wife was admitted to the hospital, and when the arrangement for monthly payments was made, the hospital knew that appellants could not pay cash for the services to be rendered to the wife. Regarding the method by which the amount of twenty dollars per month was arrived at, the former head nurse testified:

"Q. You don't know the date of this supposed agreement? A. No, I don't. Q. Nor the total amount? A. No. I knew it was terrifically high, but— Q. Didn't you make any investigation into whether or not Mr. Newby was making enough money to pay $20 a month? A. If I recall correctly, at the time that he told me—that he made the arrangements—I

don't recall what his salary was but at the time it seemed like it was large enough to cover the amount he would pay."

Mr. Wilson, a former president of the hospital, and then a member of the board, testified that the head nurse was instructed to get cash in full when a patient was discharged, and that, if this was not possible, the matter should be referred to the board. The head nurse was furnished with a printed form of promissory note for use in such cases as this. She could also make an agreement on the form, used in this case, which was part of the patient's hospital record, subject to the approval of the finance committee. The board meets once a month and reviews all delinquent accounts. In the event that the head nurse should make arrangements not satisfactory to the board, the latter would "try to make the best settlement possible with the patient."

In this case, the board at no time prior to October 3, 1953, expressed any dissatisfaction with the contract negotiated in its behalf by the head nurse with appellant husband. Even then, respondent did not express any dissatisfaction to appellants until appellant husband, on his own initiative, sought out Mr. Wainscott to ascertain what the board wanted to discuss about appellants' account.

The next event connected with this transaction was the institution of this action one week later and the immediate attachment of appellants' car without any prior demand for payment of the balance of the account.

Appellant husband was very irritated when he was summarily deprived of the use of his car. His protest to Miss Garrett, a member of the hospital board, is described in her testimony as follows:

"Well, Mr. Newby came in. He was very irritated, and he was a little abusive about us attaching his car. And I told him I was sorry he felt that way and suggested he come over to see you [attorney for the hospital]. And he told me that he was very unhappy about his car being attached, and I said, 'Would you be willing to go to the bank at this time and sign a note and pay us up so that it won't be necessary? I am sure we will be glad to withdraw it.' I suggested that he go to see you, and he said he would be—darned if he would, that he had a letter from Miss Studer

[the former head nurse], I believe he said; and he was going to go ahead with this thing. And I tried to subdue him the best I could and said I thought he should go to see you, and I thought you were very reasonable to deal with. Q. But he refused at that time to sign a note? A. Very definitely."

At the close of the testimony, the trial court rendered an oral decision stating the basis of its final ruling, in part, as follows:

"She [the former head nurse] did make the arrangement that the bill be paid off at $20 a month, which, of course, I assume was about all Mr. Newby felt that he would be able to pay and still be able to take care of his family and live. Undoubtedly the $20 a month arrangement was made on that basis that that was all he could pay, that that was the best he could do. Now, it develops later that Mr. Newby apparently should be in a position to pay more, because the attachment itself indicates that he had assets and he was able to buy an automobile. Then, of course, if he is able to do that, why, he should have been able to pay more than $20 a month on the hospital bill. The contract was wholly without consideration, and being without consideration the hospital would be entitled to demand then or other arrangements, in so far as the payment of the balance of this bill was concerned. Certainly, when they discovered that Nr. Newby was able to buy an automobile, why, necessarily, operating on a thin margin as a nonprofit organization, they felt they should not finance the automobile. That is exactly what it amounted to. By the hospital bill not being paid, it made it possible for Mr. Newby to have an automobile. So this suit was instituted. But prior thereto, however, Mr. Newby said he was going to stand on this contract. He said that was the contract, and he refused to sign the note. And that being the case, it appeared that it would be futile to try to make any further arrangements or negotiations. But even so, I think it was the duty of the hospital to formally make a demand for this balance, and they could have when they disaffirmed this contract for the reason it was not a binding contract. It would be necessary for him to pay the balance or he would be sued if he didn't make satisfactory arrangements; and he could have made satisfactory arrangements as far as the hospital was concerned by going to the bank and signing a note, and if he had a car, possibly by putting that up as security. I don't

know. But something possibly could have been worked out. But he saw fit to stand on the contract, and as a consequence he was standing on a contract which was without consideration. There was no consideration for it at all. It was a gratuitous act on the part of the hospital to say, 'Here, you pay this off at $20 a month until conditions change where you can pay more.' That is what it actually amounts to. So Mr. Newby, of course, doesn't have any business going out and buying an automobile when he owes a hospital bill to this extent. Of course, he takes his chances. He can go out and buy an automobile if he can get away with it, but the hospital didn't see fit to stand for it; and I think they had a right to demand their payment. Even after this suit was started, Mr. Newby, an opportunity was given you to go over and sign a note and make arrangements for the payment of this bill, and your car would have been released and this whole thing could have been taken care of; but you didn't do that. However, I will award judgment. I will allow Mr. Newby credit for the Court costs on this in view of the fact that notice was not formally given before the action was instituted."

The trial court's reference to appellants having purchased an automobile is not based upon anything in the record other than the sheriff's return to the writ of attachment, which states that he had attached one 1950 Ford sedan in appellants' possession.

There is no evidence indicating that appellants did buy this car, nor, if so, that it had been paid for nor any evidence as to when they bought it (if they did). It might have been purchased in 1950, 1951, or 1952, before the first hospital bill was incurred. For aught that appears in the record, they may have inherited the necessary funds from a deceased relative. There is no evidence as to how much was paid for it or whether it was a cash transaction or whether it was being purchased on another twenty dollars per month payment plan.

Since the trial court, in deciding this case, attached considerable importance to the assumed purchase of the Ford car, we feel that we should comment further on this phase of this case. Assuming that appellants did purchase a 1950 Ford sedan for cash between February 10 and October 10,

1953 (although there is no evidence on which to base such an assumption), the trial court was in error in stating that they "had no business" to buy an automobile while they owed a hospital bill of $715.86 (which was currently being reduced each month as above stated). The inference which the court seemed to draw from these assumed facts was that, since the head nurse had concluded that twenty dollars per month was all that appellants were able to pay on their hospital bill, appellants had in some manner deceived or misled the hospital as to their financial status. Of course, no fraud on the part of appellants was alleged nor proven by any evidence.

■ It has always been the rule in this state that an insolvent person may in good faith prefer one creditor over all other creditors, even to the exhaustion of his assets. *Endicott-Johnson Corp. v. Bloom*, 175 Wash. 606, 27 P. (2d) 1069.

Appellants had faithfully performed their contract (which was honestly and fairly entered into by the parties) from February to October, 1953. This arrangement was apparently satisfactory to the board of trustees, which reviewed all unpaid accounts each month. Opinions may differ as to whether a three-year old Ford is a luxury or a necessity for a farm hand living with a wife and four children on a farm three miles from the nearest town. But that is a matter for the farm hand to decide, and not the courts. This would still be true if the husband had bought a Cadillac or a helicopter. Whether such a person is improvident in so doing when he has outstanding financial obligations, is a moral issue and not a legal one. The constitution guarantees every person the liberty to do what is economically foolish as well as what may be generally considered prudent and wise. Hence, the purchase of the 1950 Ford (if made) is immaterial to this case.

We come now to the only legal question presented: Was the trial court correct in holding that the written agreement of February 10, 1953, was void for lack of consideration?

In *Vigelius v. Vigelius*, 169 Wash. 190, 13 P. (2d) 425, a

former wife sued her ex-husband for ten thousand dollars claimed due on a separation contract providing that he should pay her seventy-five dollars a month during the rest of her life or until her remarriage. He contended, and the trial court found, that the parties had mutually agreed orally twelve years before the suit to a reduction of the amounts he was to pay monthly on the contract to twenty-five dollars. On appeal, she urged that there was no consideration for the agreement to reduce the payments due her, saying that such an agreement will furnish a valid consideration for a new contract only when the contract is executory on both sides. Since the contract was executed on her part, she contended that there would be no consideration for the new agreement.

In rejecting that contention, we said:

"While Mr. Vigelius has not fully executed the modifying agreement, in the sense that he has not paid future maturing obligations thereunder, he has fully executed it to the extent of timely paying all past maturing obligations thereunder over a period of more than twelve years. *This, we are of the opinion, constitutes such an execution of the modifying agreement on his part as to warrant us in holding that it should not now be disturbed for want of consideration in its making.*" (Italics ours.)

The basis of our holding in the *Vigelius* case, though not specifically recognized as such in the opinion, was that the former wife was estopped to deny that there had been a valid consideration for the modifying agreement after having accepted the payments called for in that agreement for twelve years.

In the *Vigelius* case, the wife was held estopped to challenge the validity of the consideration for an oral contract reducing the monthly payments from seventy-five dollars to twenty-five dollars, after having accepted such payments for twelve years. The term of the contract was for the balance of the joint lives of the parties. There was no showing of what their respective life expectancies were. In the case at bar, respondent accepted the monthly payments provided for in the written agreement for ten months. By

receipt of these payments, the hospital account was reduced from $715.86 to $592.76 prior to the commencement of this action and the attachment of the Ford car. (In May, 1953, the hospital furnished medicines to appellants, and the cost of these items, totalling $6.90 was added to appellants' bill.)

Baldly stated, the situation of the parties was that on February 10, 1953, the hospital had a claim against appellants amounting to $715.86. Appellants were then insolvent in the sense that the hospital knew that they could not voluntarily pay this sum in the ordinary course and that they did not have sufficient assets exempt from execution from which a judgment in this amount could have been satisfied.

From February 10 until about October 3, 1953, both parties were content with the performance of their written contract, pursuant to which appellants were given the right to liquidate this indebtedness over a period of three years at the rate of twenty dollars per month. About this time (October 3rd), the hospital decided that it wanted its money right away, and demanded that appellants enter into a new contract in lieu of the existing one, to wit, a promissory note which the hospital could discount at a bank. Appellants stubbornly refused to execute such a note, insisting that they already had a contract with the hospital (which they were performing) which was entirely satisfactory to them. Being unable to obtain a new contract (a negotiable instrument), the hospital, without previous demand or notice to appellants, commenced this action one week later and attached the Ford car.

We hold that respondent, under the facts in this case, is estopped to deny that there was a valid consideration for the written contract. By that contract, appellants were induced to voluntarily pay to the hospital a substantial portion of a debt which they were wholly unable to pay in a lump sum when it was incurred. Without any inconvenience or expense of collection, the hospital received approximately one third of the indebtedness. Respondent

should not now be allowed to attack either the executed or the executory portion of the written contract.

That the position taken by this court (and by some other courts) is the minority view, we are well aware. In Williston on Contracts (Rev. ed.), Vol. I, § 120, pp. 415-423, the authors, advocates of the harsh common-law rule rejected in a minority of jurisdictions, bitterly criticize the reasoning supporting the view which this court has adopted and which was applied by us in the *Vigelius* case. Be that as it may, this court a good many years ago adopted the minority view in the matter of consideration and has never wavered in its adherence thereto.

We first rejected the common-law rule as to what constitutes consideration in cases involving a settlement of a liquidated debt for a lesser sum than the amount due in *Brown v. Kern*, 21 Wash. 211, 57 Pac. 798, in which we said:

"The general principle that the acceptance of a less sum of money than is actually due cannot be a satisfaction and will not operate to extinguish the whole debt, although agreed by the creditor to be received upon such condition, seems to be well established by almost uniform authority . . . For many years, however, courts have been dissatisfied with this rule and have refused to extend the doctrine, but have sought to restrict the operation of the rule whenever it was possible. *It is certainly not in accordance with ethics, and ought not to be in accord with the rules of law, to allow a creditor to enter into a contract to compromise his debt or judgment, and by reason of that compromise receive an amount of money which he could not have received except through the medium of a compromise, and then allow him to violate his contract on the plea of want of consideration and still retain the fruits of the agreement which he made to compromise. Pleas of want of consideration are not favored by the law, especially where the relative positions of the parties have been changed by the transaction.* . . . The creditor then had a judgment which was worthless in the eyes of the law, and it was certainly a consideration to him to obtain a portion of that judgment." (Italics ours.)

The reasoning of *Brown v. Kern, supra*, has been applied to a variety of situations in which a plea of want of con-

sideration has been rejected by this court. See *Conlan v. Spokane Hardware Co.*, 117 Wash. 378, 201 Pac. 26, and cases cited therein.

In the *Conlan* case, we stated the rule governing pleas of want of consideration in this language:

"An obligee who agrees to accept and accepts *something less from an obligor than full satisfaction of an obligation,* rather than take a doubtful chance of enforcing full performance, *is bound by his agreement.*" (Italics ours.)

Since, under the rule adopted by this court, the hospital would have been bound if it had accepted a payment from appellants of one half of the amount of its bill in full settlement of its entire claim, *a fortiori* it should be bound where it agreed with appellants that the *entire* bill might be paid in equal monthly installments over a period of three years. Furthermore, respondent, having accepted from appellants the payments called for in the written contract for almost a third of the period contemplated by the parties, is in no position to urge that there was no consideration for the contract.

Respondent cites and relies upon the common-law rule, quoting the Restatement of the Law of Contracts and texts and authorities from other jurisdictions adhering to that rule in all its strictness. No decision of this court cited by respondent would compel, or even allow, the result for which it contends.

In fairness to the trial court, it should be noted that neither the *Vigelius* case nor the other decisions of this court above referred to were called to its attention. We should also state that appellants were represented at the trial by counsel other than the counsel who filed their brief in this court.

For the reasons heretofore stated, the judgment is hereby reversed and the cause remanded, with instructions to dismiss the action and dissolve the attachment.

GRADY, C. J., SCHWELLENBACH, and WEAVER, JJ., concur.

HILL, J., concurs in the result.