Edward R. Hicks, Transferee v. Commissioner.
Hicks v. Commissioner
Docket No. 4121-68.
United States Tax Court
T.C. Memo 1970-267; 1970 Tax Ct. Memo LEXIS 91; 29 T.C.M. (CCH) 1175; T.C.M. (RIA) 70267; September 22, 1970, Filed George Constable, Seattle-First Nat'l Bk. Bldg., Seattle, Wash., for the petitioner. Stephen E. Silver, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent has asserted against the petitioner transferee liability for a Federal income tax deficiency due from Tussaud's Wax Museums, Inc., transferor, for the taxable year ended February 28, 1963, in the amount of $70,043.23. Since the transferor has paid $96.80 of its liability, there is presently due and owing by the transferor the amount of $69,946.43. The issue for decision is whether the petitioner is a transferee of the assets of Tussaud's Wax Museums, Inc., transferor, within the provisions of section 6901, Internal Revenue Code of 1954, [1] and the substantive *92 law of the State of Washington, so as to be liable for the income tax deficiency, plus interest as provided by law, now due and owing by the transferor. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and supplemental stipulations, together with the exhibits attached thereto, are incorporated herein by this reference. We also incorporate and adopt as our findings in this case all of the facts found by this Court in Tussaud's Wax Museums, Inc., Docket No. 1196-64, Irene Hicks, Docket No. 2094-64, and Edward R. Hicks, Docket No. 2109-64, T.C. Memo. 1966-211 (1966), particularly with respect to (1) the validity of Tussaud's royalty payment deduction, (2) other expenditures made by Tussaud's on Hicks' behalf, (3) Tussaud's claimed travel expense deduction, (4) the inclusion of drawing account funds in Hicks' income, and (5) dividends. Edward R. Hicks, Irene Hicks, and Donald R. Crysdale are citizens of Canada who entered the United States in 1961 for the purpose of forming Tussaud's Wax Museums, Inc. At the time Edward *93 R. Hicks filed his petition in this proceeding on August 28, 1968, he was a legal resident of Victoria, British Columbia. Tussaud's Wax Museum, Inc. (herein sometimes referred to as the transferor) was incorporated under the laws of the State of Washington on December 14, 1961, by Edward R. Hicks (herein sometimes referred to as the transferee) and two attorneys. The authorized capital of the transferor consisted of 10 shares of stock. Eight shares of stock were issued to the transferee; one share to Irene Hicks, spouse of the transferee; and one share to Donald R. Crysdale. Edward R. Hicks was president of the transferor corporation; Irene Hicks was the vice president and treasurer; and Donald R. Crysdale was secretary. The transferor filed its Federal corporation tax return for the period March 17, 1962 to February 28, 1963, with the district director of internal revenue at Tacoma, Washington. London Displays (Bahamas) was incorporated in May of 1962 at the direction of the Trust Corporation of Bahamas, Ltd. The stock of London Displays (Bahamas) Ltd., was owned 50 percent each by Edward R. Hicks and Donald R. Crysdale. Edward R. Hicks subsequently acquired all of the stock *94 of London Displays (Bahamas). London Displays (Bahamas) for the calendar year 1962 did not enter into any business transactions nor did it have any business purpose. Its capital stock was issued for $28. Its financial statements show that it had no income during 1962 and had cash in the bank of only $198.04. London Displays, N.V. was incorporated on May 8, 1962, in Curacao, Netherlands Antilles. London Displays N.V. is a wholly-owned subsidiary of London Displays (Bahamas) Ltd. London Displays N.V. during 1962 did not enter into any business transactions. The financial statements prepared from the books and records of London Displays N.V. show that the company had no income during 1962 and that it had no cash on hand. Its only assets consisted of $1,541.10 due from London Displays (Bahamas) in consideration of stock that had been issued and $458.90 representing the expenses incurred upon its incorporation. On December 24, 1963, respondent sent to the transferor, by certified mail, a statutory notice of deficiency determining, inter alia, a deficiency in income tax for the taxable year ended February 28, 1963, in the amount of $71,473.23. 1177 On March 24, 1964, the transferor *95 filed a petition with this Court, bearing Docket No. 1196-64, requesting a redetermination of such deficiency in income tax. The respondent duly filed an answer thereto, placing in issue all the material allegations of that petition. Royalty Issue Prior to October 29, 1961, the transferee negotiated with Mr. and Mrs. Stubergh, manufacturers of wax figures in California, to lease wax figures to be displayed at the Seattle World's Fair. The agreement reached between the transferee and the Stuberghs was executed on February 8, 1962. The transferee and Crysdale, as individuals, were the lessees of the wax figures under the agreement. The agreement provided for a total rental of $20,000, payable at $5,000 on or before delivery of the figures, with the balance to be paid in installments within 120 days after the opening of the display, which was scheduled to open at the Seattle World's Fair in the spring of 1962. The lease which Hicks and Crysdale had with the Stuberghs for the use of the wax figures during the 1962 Seattle World's Fair was not assigned to London Displays, N.V. and during such World's Fair, London Displays N.V. had no proprietary interest in the wax figures not did *96 it have a right to acquire the wax figures. The wax figures were displayed by the transferor in a display room in Seattle, which opened March 17, 1962. On the transferor's Federal income tax return for the taxable year 1963, gross income in the amount of $333,430.29 was reported as proceeds from the display of the wax figures and sale of pictures and pamphlets. On April 19, 1962, Hicks and Crysdale met in Vancouver, British Columbia, with McColl who was Hicks' attorney located in that city. At the meeting, McColl advised the transferee to conduct his venture in corporate form. McColl also outlined a proposal wherein a Bahamas' company would be established that would own 100 percent of the stock of a Curacao (Netherlands Antilles) company which would in turn own the wax figures and lease them to Tussaud's. To avoid the impact of Canadian foreign personal holding tax, it was necessary to divide the voting control of the Bahamas' company equally between Hicks and Crysdale. However, it was intended by Hicks and Crysdale that at a later time Hicks would own 90 percent of the equity in the Bahamas' company and Crysdale would own 10 percent. A Netherlands Antilles corporation, London *97 Displays Co., N.V., was formed in order to purchase the wax figures from the Stuberghs and lease them to the transferor for a royalty payment, which would be based upon a percentage of the gross receipts received by the transferor. McColl believed that London Displays Co., N.V., would be subject to a tax on accumulated earnings in Curacao, Netherlands Antilles, unless the earnings were distributed. Therefore, it was decided that a Bahamian corporation, London Displays (Bahamas), Ltd., would be formed as a parent corporation of London Displays Co., N.V., with the transferee and Crysdale as its stockholders. It was planned that funds received by London Displays, Co., N.V., as the purported "royalty payment" from the transferor, would be funneled to London Displays (bahamas), Ltd., and then to the transferee and Crysdale in Canada as its stockholders. Initially, the transferee and Crysdale were each to have a 50 percent interest in the voting stock of London Displays (Bahamas), Ltd. It was, however, anticipated that at a later date the stock ownership of London Displays (Bahamas), Ltd., would be varied so that the transferee and his spouse would own 90 percent and Crysdale 10 percent, *98 which ownership was parallel to their respective stock interests in the transferor. Tussaud's on its Federal income tax return claimed that the royalty deduction of $138,844.55 was paid to London Displays, N.V. On or about September 4, 1962, Crysdale advised McColl and Rumble to discuss with Crysdale's attorney, W. Wesselhoeft of Seattle, all matters involving a dispute between Crysdale and Hicks. This dispute arose at least as early as July 1962, and concerned the relative percentage of equity ownership which Hicks and Crysdale had in London Displays (Bahamas). In the early part of 1962, there were preliminary discussions between the Stuberghs and Hicks and Crysdale concerning the acquisition of the figures. The Stuberghs (a/k/a Showmasters Corporation) executed a conditional sales contract dated November 1, 1962, which they prepared. It purported to sell to Hicks certain wax figures for a price of $50,096.58 with a $10,000 down payment, and monthly installments of $1,500 1178 commencing February 1, 1963. This document was not executed by Hicks. On November 26, 1962, the Stuberghs told Hicks that unless a satisfactory written agreement of sale was received no later than *99 December 1, 1962, the wax figures might be removed. Shortly thereafter, by letter dated December 6, 1962, Hicks wrote to the Stuberghs advising that the letter would "serve my full intention" to purchase the entire show and nine additional figures on terms as arranged in July. The letter also states, "This purchase is to act in the interim to the finalization of the London Display Agreement." The letter was signed "E.R. Hicks - Pres. & Chairman, Tussaud's Wax Museum, Inc." On November 1, 1962, $10,000 of the moneys Tussaud's had placed in Russell & DuMoulin's trust account was transferred to the Stuberghs as a down payment on the purchase of the wax figures for the account of London Displays N.V. The Stuberghs did not accept the $10,000 as part of the purchase price in the absence of a written agreement and financial statements of London Displays N.V., and, accordingly, the $10,000 was applied to the rental from November 1, 1962 to November 1, 1963. Pursuant to the instructions in the Hicks' letter of December 7, 1962, the Stuberghs prepared a contract with Hicks as the purchaser of the wax figures which reflected the total down payment of $10,000. In January 1963, Hicks had a *100 meeting with the Stuberghs in Los Angeles. Hicks did not execute the contract at that time, but took it with him. Thereafter, Hicks called the Stuberghs and requested that the purchaser's name be changed from Edward R. Hicks to London Displays, N.V. Mr. Keller of the Stuberghs, pursuant to Hicks' instructions, wrote the name London Displays N.V., over Hicks' name and requested Hicks to have his attorneys prepare a contract that would be suitable to both of them and also furnish financial statements and evidence of the legal existence of London Displays N.V. Hicks did not have any other contract prepared. Moreover, no financial statements were ever submitted to the Stuberghs. In February 1963 the Stuberghs began to receive the monthly payments of $1,500 on the purchase price of the wax figures. In July 1963, a royalty agreement was executed by London Displays, N.V., and Tussaud's Wax Museums, Inc. The agreement was backdated to May 8, 1962. As a result of the personal conflict between Hicks and Crysdale, the implementation of the plan to set up the royalty arrangement between London Displays (Bahamas), Ltd., London Displays Co., N.V., and the transferor, was not completed until *101 July 1963. Consequently, London Displays Co., N.V., did not purchase the wax figures from the Stuberghs until 1963. During the 1962 Seattle World's Fair, London Displays, N.V., did not have a royalty agreement with Tussaud's. During the 1962 Seattle World's Fair, Tussaud's did not receive any property from London Displays N.V., which would give rise to an obligation on the part of Tussaud's to pay any money to London Displays N.V. The royalty to be paid to London Displays N.V., under the agreement was to be 50 percent of the gross income of Tussaud's during the World's Fair after deducting $50,000 from the gross income. During 1962, Hicks falsely represented to the accountants who prepared the returns of Tussaud's that London Displays N.V., owned the wax figures. Hicks thereafter submitted to the accountants the backdated agreement executed in July 1963 as their authority for claiming $138,844.55 as a deduction for royalty payments claimed to have been made to London Displays N.V. Hicks did not tell his accountants that he and Crysdale had leased the wax figures personally nor did he tell the accountants how the funds that were sent to McColl's trust account were being disbursed.
*102 The transferor, after paying its operating expenses and providing for working capital, transferred the balance of all its funds to Russell & DuMoulin, the law firm in Vancouver, Canada, in which McColl was a partner. Russell & DuMoulin received $141,000 from Tussaud's which was deposited in the attorneys' trust account. The funds so received were as follows: Received by
Russell & DuMoulin Certified Checks
Mar. to Dec.
Total
Number
Date
1962
3-21-63
3-17-62 3-21-63
265
6-14-62
$ 10,000.00
290
7-5-62
10,000.00
366
7-20-62
25,000.00
612
10-12-62
50,000.00
179
4-23-62
$10,000.00
218
5-15-62
1,000.00
867
3-21-63
$35,000.00
$106,000.00
$35,000.00
$141,000.00 1179 Of the funds transferred to Russell & DuMoulin, Tussaud's claimed a deduction on its Federal income tax return for the period ending February 28, 1963, of $138,844.44 as wax figurine royalties. On October 27, 1962, the transferee drew a check payable to the Internal Revenue Service on the account of the transferor in the amount of $35,000. This amount was recorded in the books of the transferor as a reserve for taxes. However, this check *103 was not sent to the Internal Revenue Service but rather, on March 21, 1963, deposited in the transferor's bank account and, on the same day, sent to Russell & DuMoulin. Disbursements made from the trust account, held by Russell & DuMoulin from May 2, 1962, through February 28, 1963, were as follows: Elizabeth B. Hicks, Mother of the transferee
$36,500.00
Donald Hicks, Brother of the trans- feree
2,000.00
Mr. & Mrs. Stubergh, Lessors of the wax figures
17,021.87
Other disbursements to or for the benefit of persons
11,040.53
who had loaned money to the transferee The disbursements totaling $11,040.53 were made on the instructions of the transferee. In 1962, Edward R. Hicks, the transferee, received directly or indirectly $182,628.94 from Tussaud's. During the period from May 2, 1962 through February 28, 1963, no disbursements were made to London Displays (Bahamas), Ltd., or London Displays Co., N.V., from the trust account. Mr. McColl on occasion received checks from the transferor, which he cashed, remitting portions to the Stuberghs or others, and crediting the balance to the trust account. This method occurred twice where the trust account *104 shows that Russell & DuMoulin received checks for $10,000 from the transferor on or about May 2, 1962, and July 9, 1962, but only $1,500 and $5,000, respectively, were credited to the trust account on those dates. On several occasions during the early part of 1963, the transferee directed Russell & DuMoulin by letter to disburse sums of money from the trust account. For example, on March 22, 1963, the transferee directed a disbursement of $15,000 to the transferee's mother. The ledger of the trust account, dated March 22, 1963, reflects a disbursement of $15,000 to the transferee's mother. The funds transferred from Tussaud's to Russell & DuMoulin's trust account were disbursed to the bank account of Hicks' mother, to Hicks personally or others in payment of Hicks' debts at his direction. Robert L. Thompson, CPA, is employed by the accounting firm of Benson & McLaughlin, 725 Minor, Seattle, Washington. Thompson prepared the United States Corporation Income Tax Return, Form 1120, for the period ending February 28, 1963, from the books, records, and ledger accounts of Tussaud's Wax Museums, Inc. The balance sheet as it appears on this return is an accurate summary of the ledger *105 accounts of Tussaud's Wax Museum, Inc., as of that time. Assets
Cash
$36,249.05
Prepaid expenses
665.62
Loans to stockholders
17,304.87
Buildings & other fixed depreciable… $39,508.12
Less: depreciation… 10,869.30 28,638.82
Deferred interest
1,343.99
Intangible… 1,118.11 Less: amortization… 200.09 918.02
Other - deposits
275.00
Total Assets
$85,395.37
Liabilities & Capital
Accounts payable
$ 4,332.54
Mortgages, notes & bonds (less than yr.)
2,720.04
Other - taxes payable
779.81
Wax figurine royalties payable
36,344.55
Mortgages, notes & bonds (yr. or more)
3,659.40
Salaries payable
20,000.00
Federal income tax payable
5,063.89
Common stock
500.00
Earned surplus and undivided profits
11,995.14
Total Liabilities & Capital
$85,395.37 1180 Salary Issue At the time that Hicks entered the United States in 1962 to operate Tussaud's Wax Museums, Inc., during the 1962 Seattle World's Fair, he had not secured a permanent visa. Under his temporary entry permit, he was not allowed to earn a salary. Prior to this entry, Hicks was advised that as an alien he was not permitted to work in the United States for a salary.
*106 Hicks and Crysdale entered into an agreement between themselves as to the amount of money that each would draw as salary. This salary was charged upon the books of the corporation as a draw. During the period February 2, 1962, to December 19, 1962, Tussaud's disbursed the following checks in the amount of $13,961.78 to the following payees: Date
Payee
Amount
2- 2-62
E. R. Hicks
$ 300.00
3-10-62
E. R. Hicks
250.00
3-22-62
Corbitt & Company, Inc
250.00
3-30-62
Prottas & Leavitt
300.87
4-23-62
Petty cash
500.00
5- 4-62
Mildred Bigford
225.00
5- 4-62
Mildred Bigford
175.00
5-10-62
Sears
247.94
4-10-62
Seattle Tree Service
12.00
5-15-62
David R. McAdams
3,000.00
5-10-62
Cash
1,200.00
6- 8-62
M. Bigford
60.50
6-14-62
Bon Marche
56.30
6-14-62
Gardner services
24.01
6-14-62
Carnation Milk Company
50.00
6-28-62
Dennisons
82.28
6-28-62
Seattle Surplus
76.39
7- 2-62
Mildred Bigford
165.70
7- 2-62
Bryant's Marina
44.65
7-11-62
Edward R. Hicks
100.00
7-13-62
Edward R. Hicks
375.00
7-16-62
John Shadwell
50.00
7-23-62
Mass. Radio School
300.00
7-23-62
Edward R. Hicks
200.00
7-23-62
Edward R. Hicks
100.00
7-27-62
Edward R. Hicks
275.00
8- 7-62
Edward R. Hicks
100.00
8-15-62
Edward R. Hicks
275.00
8-28-62
Edward R. Hicks
375.00
8-30-62
Carnation Milk Company
88.06
8- 3-62
Laurelhurst Fuel
15.20
8-30-62
Seattle Engineering
6.75
9-10-62
Edward R. Hicks
375.00
9-14-62
Edward R. Hicks
100.00
9-14-62
Wiesfields
174.03
9-26-62
Edward R. Hicks
500.00
10- 8-62
Edward R. Hicks
375.00
10-15-62
Edward R. Hicks
375.00
10-29-62
Edward R. Hicks
375.00
10-29-62
Petty cash
50.00
11-13-62
Edward R. Hicks
375.00
11-28-62
Edward R. Hicks
46.58
11-28-62
Edward R. Hicks
328.42
12- 6-62
Edward R. Hicks
62.10
12-19-62
New Washington Hotel
100.00
12-19-62
Jack Keller
1,400.00
Total:
$13,916.78
*107 The individual amounts of these checks were reflected on Tussaud's books and records in an asset account entitled "Due from Officer - Hicks." These amounts were distributed for the personal benefit of Edward R. Hicks. Tussaud's claimed a deduction on its Federal income tax return for the period ending February 28, 1963, in the amount of $20,000 for Hicks' salary. This amount was accrued on Tussaud's books as salaries payable, but was not paid within two and one-half months after the close of its taxable year. No payroll checks or other checks were issued in direct payment of the purported $20,000 salary. This amount was to be offset by Hicks' drawing account. Hicks resided in the United States during the calendar year 1962. During 1962 Hicks had income which was subject to United States income taxes. However, Hicks did not file a United States income tax return for the calendar year 1962. Mr. Benson who was Hicks' accountant and tax advisor advised Hicks to report the $20,000 referred to above as salary. Hicks did not file a timely United States income tax return for 1963. On June 19, 1964, Hicks filed a United States income tax return for 1963. Hicks did not declare the $20,000 *108 as salary on this return. On March 20, 1963, Hicks was questioned by a representative of the Immigration & Naturalization Service. Hicks was asked whether he drew a salary from Tussaud's. He replied that he drew only "loans against the company and * * * dividends." On the Canadian income tax return filed by Hicks for the calendar year 1962, no United States source income was reported. However, Hicks filed an amended return for 1962 which reported United States source income of $10,000 as salary from Tussaud's. On Hicks' 1963 Canadian income tax return, $20,000 was reported as United States source income from wages received from Tussaud's. On the Canadian income tax return filed by Hicks for the calendar years 1962 and 1963, Hicks represented himself as being a Canadian resident. Collection Attempts On November 8, 1963, revenue officer George Applebaum caused a Notice of Federal Tax Lien to be filed in King County, Washington, against Tussaud's. 1181 On November 8, 1963, revenue officer Applebaum caused a Notice of Federal Tax Lien to be filed in King County, Washingtton, against Edward R. and Irene Hicks. On November 22, 1963, revenue officer Applebaum received *109 a Status Report, Form 2209-A, from revenue officer David Ip of San Francisco. On November 8, 1963, Ip served a Notice of Levy on Tommy Fong. He also filed a Federal tax lien against Tussaud's in San Francisco on that date. Tommy Fong was displaying the wax figures that had been in Seattle, Washington. On December 6, 1963, revenue officer Applebaum made a recommendation for a jeopardy assessment against London Displays Co., N.V. "Transferee of Edward and Irene Hicks." This administrative procedure was felt to be necessary in order to prevent the removal of any assets from the United States. On December 12, 1963, revenue officer Applebaum caused new Notices of Federal Tax Liens to be filed in King County, Washington, against Edward R. Hicks and Irene Hicks, a/k/a London Displays Co. N.V., and Tussaud's Wax Museum, Inc., a/k/a London Displays Co. N.V. On December 11, 1963, revenue officer Applebaum directed an inquiry to the Internal Revenue Service office in Los Angeles for the purpose of determining who owned the wax figures. On that date, he also sent a Status Report, Form 2209-A, to San Francisco. In that report the San Francisco office was directed to demand payment from Fong *110 of the funds in his possession. On December 18, 1963, revenue officer George Applebaum caused to be filed a Notice of Federal Tax Lien against Tussaud's Wax Museums, Inc., a/k/a London Displays Co. N.V., in King County, Washington. On December 26, 1963, revenue officer Applebaum received a Status Report, Form 2209-A, from revenue officer Harold Svendsgaard of the San Francisco office. In that report Svendsgaard confirmed the seizure of the wax figures on display at Fong's Wax Museum by the Internal Revenue Service. On December 30, 1963, a conference was held in the Regional Counsel's office of the Internal Revenue Service. The following people were present: Norman McNeil, an attorney for Regional Counsel; George Constable, attorney for Tussaud's; and George Applebaum, revenue officer. The jeopardy assessments against Tussaud's and Hicks were discussed at that conference. Mr. McNeil suggested to Mr. Constable that Hicks and Showmasters (the Stuberghs) place a bond with the district director in an amount equal to the value of the seized property. Mr. Constable stated that he would attempt to arrange for a conference of all of the above parties to discuss the possibility of placing *111 the abovementioned bond. On or about December 31, 1963, Mr. Constable telephoned revenue officer Applebaum. He stated that he had arranged to meet with Hicks and his Canadian attorneys in Vancouver, B.C., on Friday, January 3, 1964, and he would then arrange for a conference in San Francisco on Tuesday, January 7, 1964. The parties to be represented at the conference in San Francisco were to be as follows: Attorney Varnum Paul representing Tommy Fong in San Francisco, proprietor of Madame Tussaud's Wax Museums, Inc.; Attorney Maxwell representing Stuberghs (showmasters Corporation); Edward R. Hicks; and George Constable. The purpose of this conference was to discuss overall problems of Hicks, Tussaud's, London Displays, N.V., and the placing of the bond. On January 8, 1964, revenue officer Applebaum received a telephone call from Constable, who stated that he had just obtained power of attorney to act on behalf of Edward Hicks, Irene Hicks, and Tussaud's in their income tax affairs. On January 8, 1964, revenue officer Applebaum delivered to Constable Form 17, Statement of Taxes Due, for Tussaud's Wax Museums, Inc., and Edward R. and Irene Hicks. Mr. Applebaum made the demand *112 upon Mr. Constable for payment of these taxes in the following amounts: Tussaud's Wax Museums, Inc.
$133,135.14
Edward R. and Irene Hicks
83,063.27
On January 10, 1964, revenue officer Svendsgaard received a telegram from Mr. Constable. Constable indicated that the wax figures displayed by Fong belonged to London Displays, N.V. On January 14, 1964, revenue officer Svendsgaard served a summons upon Madame Tussaud's Wax Museums, Inc. (a California corporation), attention: Thomas L. Fong, to produce records relating to payments made by Fong to London Displays, N.V. 1182 Following the service of the Form 17, Statement of Taxes Due, revenue officers in Seattle, Los Angeles, and San Francisco attempted to collect the tax thought to be due and owing by Tussaud's. On June 23, 1964, revenue officer Applebaum visited 1611 Westlake Avenue in Seattle, Washington. At that time he discovered Tussaud's to be in operation. Mr. Applebaum talked with Mrs. Vera Grahn, the person in charge of the museum. Mrs. Grahn stated that she was employed by Edward R. Hicks to operate the wax museum. Mr. Applebaum observed the City of Seattle business tax stamp on the wall; *113 also posted on the wall was the State of Washington corporation license of Tussaud's. Mrs. Grahn refused to answer any of revenue officer Applebaum's questions regarding the business operations. Mrs. Grahn referred Mr. Applebaum to Mr. Constable and to the firm of Benson & McLaughlin, the accountants for Tussaud's. On June 24, 1964, revenue officer Applebaum contacted Constable regarding the wax museum. Constable requested a conference with Regional Counsel. Mr. Applebaum arranged a conference on that date at 2 p.m. Present at the conference were: Richard Schwartz, Assistant Regional Counsel; Thomas Winter, attorney, Regional Counsel; Richard Hickok, attorney, Regional Counsel; Robert Chandler, Special Agent, Intelligence Division; William McLeod, Internal Revenue Agent, Audit Division; George Applebaum, Revenue Officer; and George Constable, attorney for Tussaud's. Mr. Constable admitted Tussaud's was in operation at 1611 Westlake Avenue, Seattle. He proposed the establishment of a trusteeship under which plan all profits, after payment of current operating expenses, would be held in a trust fund account pending the outcome of the Tax Court proceedings involving Tussaud's Wax Museums, *114 Inc. , Irene Hicks, and Edward R. Hicks v. Commissioner of Internal Revenue, Docket Nos. 1196-64, 2094-64, and 2109-64, respectively. Mr. Winter recommended acceptance of the proposed plan. Mr. Schwartz concurred with him. Mr. Constable said that he would prepare a formal written proposal within the next week or ten days outlining the details of this plan. Mr. Constable agreed to mail the original of the proposal to the Office of Regional Counsel in Seattle and a copy to Applebaum. On August 20, 1964, revenue officer Applebaum telephoned Constable. Mr. Applebaum asked Mr. Constable when a formal proposal would be submitted covering the Tussaud's operation in Seattle as promised at the June 24, 1964, conference. Mr. Constable said that he would do so shortly. Thereafter, in a letter from Constable to Applebaum, Constable indicated that he would have an agreement prepared by September of that year. On October 23, 1964, revenue officer Applebaum received a copy of a rough draft of the unsigned agreement which George Constable had submitted to the Regional Counsel attorney, Thomas Winter, on October 23, 1964. On September 2, 1965, revenue officer Applebaum talked with Mr. Constable *115 on the telephone. Applebaum requested Constable to furnish the Government a current statement of the assets of Tussaud's. Mr. Constable said that the wax figures which had been displayed in Seattle in 1964 had been shipped to the Tussaud's Hollywood Wax Museum, Inc., a California corporation, and although a lease agreement was then in effect between Hollywood Wax Museum as lessee and London Displays, N.V., no payment had been received under it. Mr. Constable said that he had been advised by Hicks that funds would become available near the end of 1965 under the lease. On September 10, 1965, Constable telephoned Applebaum regarding the accounting of Tussaud's funds which Applebaum had requested on September 2, 1965. Mr. Constable stated that the Hicks' case was going to be heard by the Tax Court on September 13, 1965, and that he would therefore require several days after the trial to prepare an accounting. Mr. Constable stated that Mrs. Vera Grahn, the former manager of Tussaud's, and the company accountants would assist him in the preparation of this accounting. On November 2, 1965, revenue officer R.D. Leslie served a Notice of Levy upon Mr. Spoony Singh, the operator of Tussaud's *116 Hollywood Wax Museum. On January 18, 1968, revenue officer Applebaum telephoned Mr. Constable with regard to the unfiled Federal corporate income tax return of Tussaud's for the fiscal year ending February 28, 1967. Mr. Constable said that Mr. Hicks was out of town, but that he would mail the corporate 1183 tax return to Mrs. Hicks in Victoria, B.C. Mr. Constable said that he was certain that Hicks would receive the return within a few days, sign it and return it to him. Applebaum asked Mr. Constable about the present finances of Tussaud's. Mr. Constable said that Tussaud's assets amounted to less than $100. Thereafter, on March 15, 1968, Applebaum received from Constable the corporation income tax returns of Tussaud's Wax Museums, Inc., for the fiscal years February 28, 1967, and February 28, 1968; both of these returns were marked "no activity." In addition, the February 28, 1968, return was marked as the final return. Mr. Constable submitted a letter with these returns, together with a cashier's check in the amount of $96.80. Mr. Constable stated in his letter that these funds represented all of the assets of Tussaud's Wax Museums, Inc. Transferor's Liability In the decision *117 entered on March 30, 1967, by Judge Drennen of this Court, it was decided that Tussaud's Wax Museum owed a deficiency in income tax for the taxable year ended February 28, 1963, of $70,043.23. To date, only $96.80 has been paid by Tussaud's to satisfy this outstanding obligation. Ultimate Findings 1. Every reasonable attempt has been made by the Internal Revenue Service to collect the tax from the transferor. Additional attempts to collect the tax from the transferor would be futile. 2. The transfers to the trust account were made without any consideration since London Displays Co., N.V., did not have any economic interest in the wax figures on display. 3. The total amount of cash transferred by the transferor to the transferee is in excess of the deficiency in income tax due and owing from the transferor, plus interest thereon as provided by law. 4. By reason of the transfers of the cash by the transferor to the transferee, the transferor was rendered, and is, insolvent without any assets whatsoever with which to pay the deficiency in income tax due from it for the taxable year ending February 28, 1963, plus statutory interest thereon. 5. Under the substantive law of *118 the State of Washington, the transfer of funds to the so-called trust account in Canada was made without fair consideration, as defined under RCWA 19.40.030 (1961). 6. Under RCWA 19.40.040 (1961), the transfer of the funds made by Tussaud's, which was thereby rendered insolvent, was fraudulent as to the United States, without regard to the actual intent of Tussaud's, since the transfer of funds was made without fair consideration. 7. The transfer of funds was made with intent to hinder, delay or defraud the United States, who was then an existing creditor of the transferor. Opinion It is our view that the petitioner is collaterally estopped from relitigating those facts and issues which were litigated in the prior proceedings ( Tussaud's Wax Museums, Inc., T.C. Memo. 1966-211), involving the transferor, himself and his wife. Commissioner v. Sunnen, 333 U.S. 591 (1948). Petitioner, a party to the prior proceedings and a "privy" with the transferor, has once again come before this Court advancing some of the same arguments which were previously rejected. The doctrine of collateral estoppel applies to a transferee and he is thus precluded from reopening *119 a decision establishing the tax liability of his transferor. David Krueger, 48 T.C. 824 (1967). Accordingly, we hold that petitioner is precluded from either relitigating the royalty deduction issue or making a new argument that he should have received a substantial salary for promoting the wax museum, evidence of which could have been offered in the prior proceedings. In any event, respondent requested this Court to take judicial notice of the findings of fact made in the prior proceedings. At the time this request was made at trial, respondent offered in evidence the entire record from the prior proceedings for the limited purpose of the Court taking judicial notice of those findings. Petitioner has denied in his reply the accuracy of portions of the prior findings of fact. Respondent submits, and we agree, that the findings of fact from the prior proceedings are prima facie evidence of those facts, thereby shifting the burden of going forward in controverting those facts to petitioner. Funk v. Commissioner, 163 F. 2d 796, 802 (C.A. 2, 1947). Since no contradictory evidence was offered by petitioner, we conclude, under the rationale of Funk, that the prior *120 findings are established for the purpose of this case. Consequently, we must now resolve only the legal question of whether, under the substantive law of the State of Washington, petitioner became a transferee of the assets 1184 of Tussaud's within the provisions of section 6901 of the Code. Under section 6901 the respondent may proceed against a transferee of property with respect to the assessment and collection of income taxes owed by the transferor. However, it does not impose liability on the transferee but merely provides the respondent with the procedural remedy to enforce the existing liability of the transferor. The existence and extent of transferee liability is determined by principles governing the rights of creditors as determined by applicable State law. Stern v. Commissioner, 357 U.S. 39 (1958). Since the transfers that form the basis for asserting transferee liability occurred in the State of Washington, the principles of creditors' rights, as applied by the Courts of that State, determine the existence and extent of any liability on the part of petitioner as a transferee of the corporate assets of *121 Tussaud's. Harriet Fibel, 44 T.C. 647, (1965); Estate of Henry Miller, 42 T.C. 593, 598 (1964). The State of Washington has adopted the Uniform Fraudulent Conveyance Act. Under the Act, a transferee will be liable to a creditor of the transferor of whenever the transferee receives property without fair consideration and the transferor was insolvent at the time of the transfer or was rendered insolvent thereby. See RCWA 19.40.040 (1961). The Act also imposes transferee liability where property is transferred with actual intent on the part of the transferor and transferee to hinder, delay or defraud either present or future creditors. See RCWA 19.40.070 (1961). If the transfer falls within the meaning of RCWA 19.40.070 (1961), then the creditor does not have to show that the transferor was insolvent at the time of the transfer or rendered insolvent thereby. The Act is construed by the states that have encated it on a uniform basis. See RCWA 19.40.120 (1961). Accordingly, in absence of controlling cases by the courts in the State of Washington, opinions of this Court which have construed the Act as it has been applied in other states are controlling. In this *122 case the respondent has established transferee liability in equity by proving: 1. A Transfer of Property As a prerequisite to the imposition of transferee liability, section 6901(a)(1) implicitly recognizes that there must be a transfer of property. It is well settled that where a corporation makes a payment for the stockholder's benefit or at his direction in discharge of his obligation or for any other personal reason of the stockholder, this will form a sufficient basis for asserting transferee liability against the stockholder. Harriet Fibel, supra at p. 658. The findings in the prior proceedings show that petitioner and his wife received directly or indirectly from Tussaud's $90,559.31 for the period from March 1, 1962 to February 28, 1963. Petitioner also received an additional $35,000 on March 21, 1963. These payments to petitioner or for his benefit form a sufficient basis for asserting transferee liability. Under the Act, a "conveyance" includes payment of money. See RCWA 19.40.010 (1961). 2. A Transfer Was Made Without Consideration or for Less than Adequate Consideration Because London Displays Co., N.V., had no economic interest in the wax figures *123 displayed by the transferor, payment of a so-called royalty allegedly to London Displays Co., N.V., during the taxable year ended February 28, 1963, of $118,844.55 lacked consideration. It should be noted that this Court found in the prior proceedings that even though McColl's records indicated that he was receiving funds purportedly from London Displays (Bahamas), Ltd., such funds, in fact, were being disbursed on the instruction of petitioner primarily for his personal benefit. Payment of petitioner's personal expenses also lacked fair consideration. See RCWA 19.40.030 (1961). 3. The Transfer Was Made After the Tax Liability of the Transferor Had Accrued Transferee liability in equity extends to the tax liability of the transferor for the year of the transfer and prior years. R.E.Wyche, 36 B.T.A. 414 (1937). The transferee will be liable for the unpaid taxes of the transferor which have accrued at the time of the transfer, notwithstanding that such taxes were asserted subsequent to the transfer, or that the existence of such liability was not even known at the time of the transfer. *124 Elaine Yagoda, 39 T.C. 170 (1962), affd. 331 F. 2d 485 (C.A. 2, 1964), certiorari denied 379 U.S. 842 (1964). The statutory notice of deficiency was sent to the transferor in December 1964. 1185 The Tax Court, on March 31, 1967, upheld the deficiency in income tax due from Tussaud's for the taxable year ended February 28, 1963, in the amount of $70,043.23. Although the determination of the tax liability had occurred after the transfer, the transferee is liable retroactively for the transferor's taxes in the year of the transfer to the extent of assets received from the transferor. Archie A. Swinks, 51 T.C. 13, 17 (1968). Under the Act, the United States had an unliquidated claim. See RCWA 19.40.010 (1961). In Peterson v. Badger State Land Company, 86 Wn. 530, 150 Pac. 1187, 1189 (Sup. Ct. 1915), the Washington Supreme Court found that an existing creditor was defined as one having an existing equity; the term implying an existing right to future payment. Under RCWA 19.40.010 the United States was clearly an existing creditor. 4. The Transferor Was Insolvent at the Time of the Transfer, or Was Rendered Insolvent *125 by the Transfer An essential element to the imposition of transferee liability in equity is the showing of insolvency of the transferor at the time of the transfer, or insolvency resulting from the transfer itself. Sidney Kreps, 42 T.C. 660, 670 (1964), affd. 351 F. 2d 1 (C.A. 2, 1965); Estate of Henry Miller, supra at p. 599. See RCWA 19.40.040 (1961). A showing of actual fraud is not necessary. The balance sheet of Tussaud's for the period ended February 28, 1963, as set out in our findings of fact, shows assets of $85,395.37 and total liabilities and capital of the same amount. When the $70,043.23 Federal tax liability is reflected on the balance sheet, it is apparent that Tussaud's was insolvent under the Act as of February 28, 1963. See RCWA 19.40.020(1) (1961). As of February 28, 1963, liabilities exceeded assets by $58,548.09. (Assets of $85,395.37 subtracted from liabilities shown on the balance sheet of $73,900.23 and the tax deficiency of $70,043.23.) Moreover, some of the assets listed are of questionable value, e. g., "Loans to stockholders." In this connection, this Court in the prior proceedings was not convinced that this *126 asset represented "a bona fide debt * * * which Hicks intended to repay." History supports this statement because petitioner has never repaid this so-called "loan." The balance sheet shows the assets and liabilities as of February 28, 1963. When the $35,000 cash payment which Tussaud's made on March 21, 1963, is reflected on the balance sheet, it becomes obvious that Tussaud's was insolvent at the time of this major transfer. There is another test the Courts have used. Where more than one transfer is involved, such as the situation here, and the transferor was neither insolvent at the time of any major transfer nor rendered insolvent by any such transfer, insolvency may nevertheless be established as to such transfer by proving that it was one of a series of transfers in pursuance of a plan which would ultimately leave the transferor insolvent. J. Warren Leach, 21 T.C. 70 (1953). We think this Court's finding in the prior proceedings supports a finding in this case that the so-called royalty payments were made in pursuance of a plan which was intended to ultimately leave the transferor without funds to pay the Federal taxes that were subsequently determined to be *127 due and owing. 5. The Transfer Was Made with Actual Intent on the Part of the Transferor and the Transferee to Hinder, Delay or Defraud Either Present or Future Creditors Under RCWA 19.40.040 (1961), it is necessary to show that at the time of the conveyance, the transferor was insolvent or rendered insolvent thereby. Blanche S. Sharp, 35 T.C. 1168, 1177 (1961). There is, however, another avenue a creditor can pursue without first showing that the transferor was insolvent at the time of the conveyance or rendered insolvent thereby. RCWA 19.40.070 (1961) has been interpreted to provide that where the transferor and transferee intend to hinder, delay or defraud either present or future creditors, such conveyance will be fraudulent per se without regard to the requirements that RCWA 19.40.040 first be met. Louise Noell, 22 T.C. 1035, 1042 (1954), Supplemental Opinion 24 T.C. 329 (1955). A creditor can invoke RCWA 19.40.070 if he can show a voluntary transfer of property without consideration at a time when the transferor had outstanding debts. In this instance, the transfer under the Act is presumptively fraudulent as to creditors and the *128 burden falls on the transferee to establish that the transferor was not insolvent at the time of the transfer. Sidney Kreps, supra at p. 671. Accordingly, 1186 the burden of going forward with the evidence is shifted to the transferee where there is proof that transfer was without consideration. The Courts in the State of Washington have interpreted the Act consistent with the Kreps decision. See Workman v. Bryce, 50 Wn. 2d 185, 310 P. 2d 228, 231 (1957). The same result reached in Kreps should be applied here. Petitioner had actual knowledge that the payment of the so-called royalties was without fair consideration. He knew that no bona fide lease or contract of sale was in existence between London Displays, N.V., and the Stuberghs. He knew that because no lease was in existence, Tussaud's would have an increased tax liability of approximately $75,000 to $80,000. In a letter dated December 11, 1962, to petitioner from his accountant, it was stated: The most important thing needed at the moment is a copy of the lease regarding the rental of the wax figures. I must have this before I can prepare the tax return, as there is information which should *129 be written in the lease that will have to be incorporated in the tax return. This tax return will have to be filed on or before January 15, 1963, but because of my busy schedule in January, it will be necessary to complete the return by December 31, 1962. If everything turns out approximately as you and I talked about the other day, the U.S. Corporation income tax should be a sum of between $15,000 and $18,000. Failure to have a properly executed lease with respect to the wax figures and resulting loss of the rental amounts paid, would increase the tax liability of the U.S. Corporation by $75,000 or $80,000. This letter shows that petitioners as both the transferor and transferee knew that the payment of the so-called royalties was fraudulent within the meaning of the Act. See Columbia International Corporation v. Perry, 54 Wn. 2d 876, 344 P. 2d 509, 511-512 (1959); Schanno v. Pangle, 19 Wn. 2d 539, 143 P. 2d 540, 541 (1943); Endicott-Johnson Corporation v. Bloom, 175 Wn. 606, 27 P. 2d 1069, 1072 (1933). 6. The Value of the Assets Transferred on the Dates of Transfer It is well settled that *130 the liability of a transferee in equity is limited to the value of the assets received from the transferor. Phillips v. Commissioner, 283 U.S. 589 (1930). In this case the liability of the transferee goes to the tax liability of the transferor including interest. Estate of Henry Miller, supra; Leo L. Lowy, 35 T.C. 393 (1960). The facts show that petitioner beneficially received directly or indirectly the lion's share of the funds disbursed from the trust account. The testimony of Special Investigator Braden is helpful on this point. He testified that petitioner received approximately $183,000 before expenses, directly or indirectly from Tussaud's. Since most of the property transferred was cash, there is no problem concerning valuation. Similarly, the value for the use of the corporate property is also easily ascertainable since this was established in the prior proceedings. 7. The Value of the Transferor's Assets at the Time of Respondent's Determination of Transferee Liability When respondent issued the notice of deficiency to petitioner on May 28, 1968, Tussaud's had no assets. 8. The Tax Deficiency of the Transferor Remained Unpaid *131 at the Time of the Termination of Transferee Liability Tussaud's had paid only $96.80 of the outstanding tax liability up to the date of trial. 9. Every Reasonable Attempt Was Made by Respondent to Collect the Tax from the Transferor Every reasonable attempt has been made by respondent to collect the tax from the transferor. The collection efforts of respondent are fully set out in our findings of fact herein. We think any additional attempts would be futile. All in all, we are persuaded that the petitioner has played a shell game with the assets of the transferor. We are convinced that the moneys were transferred with actual intent on the part of Tussaud's and petitioner to hinder, delay and defraud the collection of the Federal income taxes which this Court found were due and owing. We therefore hold that the petitioner is liable for the transferor's unpaid Federal income taxes, plus interest as provided by law. Decision will be entered under Rule 50. 1187 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩